# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOLORES GAINES, an individual; RYAN BAGSBY, an individual; MARIO HALL, JR., an individua, BRANISHA NEWBERRY, an individual; and KENYATA MARTIN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>AT&T MOBILITY SERVICES, LLC, a Delaware Limited Liability Company; EMMANUEL (MANNY) MORALES, an Individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 19-cv-946 GPC MSB<br><br>**ORDER DENYING AT&T'S MOTION TO COMPEL ARBITRATION AND DENYING AT&T'S MOTION TO STRIKE**<br><br>**[ECF Nos. 30, 31]** |

Before the Court are Defendant AT&T Mobility Services LLC's ("AT&T") Motion to Strike the First Amended Complaint (ECF No. 30) and Motion to Compel Individual Arbitration as to Plaintiffs Branisha Newberry and Kenyata Martin (ECF No. 31). Defendant Emmanuel (Manny) Morales ("Morales") joins both motions. ECF Nos. 32, 33.

1

## BACKGROUND

Plaintiffs are five former African-American AT&T employees who worked at the AT&T store in Mission Valley. Defendant Emmanuel (Manny) Morales acted as the store's manager. Plaintiffs bring this action under 42 U.S.C. § 1981, alleging that Morales discriminated against Plaintiffs based on their race, pushed out Plaintiffs based on his racist animus, and retaliated against Plaintiffs who complained about his behavior. Plaintiffs additionally allege that AT&T's senior management tolerated and encouraged Morales' behavior. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees and other costs associated with this lawsuit, and declaratory and injunctive relief.

According to the First Amended Complaint ("FAC"), Morales was hired in 2007 and was promoted from entry-level retail sales consultant to become an Assistant Store Manager ("ASM"). ECF No. 26 ¶ 27. Plaintiffs allege that Morales received this promotion due to his close personal friendship with Area Retail Sales Manager ("ASRM") Jesus Barraza. *Id.*

In 2010, two AT&T employees (not Plaintiffs) submitted complaints about Morales and Barraza. The complaints alleged that Morales specifically engaged in sexually inappropriate behavior and psychologically abused employees. *Id.* ¶¶ 30-36. The complaints also noted that Morales seemed "untouchable" due to his close personal relationships with individuals in upper management positions. *Id.* ¶¶ 30(d), 33(f). Plaintiffs allege that AT&T investigated Morales in 2010 (at least in part due to the aforementioned complaints), and Morales resigned in order to avoid a potential termination. *Id.* ¶ 35.

In 2012, AT&T rehired Morales as a retail sales consultant ("RSC") at one of AT&T's Las Vegas offices. Plaintiffs allege that AT&T rehired Morales at the behest of Barraza, who was then working as an ARSM at AT&T's Las Vegas branch. *Id.* ¶ 37. Barraza relocated to San Diego in August 2014 as a retail store manager ("RSM") of the

Plaza Bonita store. *Id.* ¶ 38. Barraza was then promoted to become the ARSM of the south San Diego region, and Morales was hired as the new RSM of the Plaza Bonita store to replace Barraza. *Id.* ¶ 39. Plaintiffs allege that AT&T promoted Morales at Barraza's behest. *Id.*

### a. Mission Valley Store

The Mission Valley AT&T store is the flagship store in San Diego county and offered the most favorable promotion and commission opportunities for Plaintiffs. *Id.* ¶¶ 97, 104. Plaintiffs allege that Barraza, with the assistance of ARSM Joe Reichow, successfully lobbied for Morales to be appointed as the RSM of AT&T's Mission Valley store – the most prestigious and important AT&T retail store in San Diego County. *Id.* ¶ 40. Plaintiffs allege that Reichow, the ARSM of Central San Diego and Morales' supervisor, supported Morales' promotion since Morales had achieved positive sales results while managing the Plaza Bonita store. *Id.* ¶ 43.

When Morales began working as RSM at the Mission Valley store in April 2015, there were seven African-American employees working as subordinate employees at the store. *Id.* ¶ 52. Plaintiffs allege that once Morales was appointed as RSM of the Mission Valley store, he began targeting the African-American employees by harassing them and making racist remarks towards them and to other employees about them. *Id.* ¶¶ 50-51. Plaintiffs allege that by August 30, 2016, when AT&T fired Morales for sexually harassing multiple female employees, all seven of the African-American employees had either been fired, resigned, or transferred from the store due to Morales' conduct. *Id.* ¶ 52.

### b. Plaintiffs

Plaintiffs allege that Morales engaged in a pattern of unfair criticism and discipline, micro-management, assignment of less desirable tasks, and open hostility towards Plaintiffs, motivated by his racial animus.

Plaintiff Dolores Gaines is a seventy-year-old African-American woman who worked at the AT&T Mission Valley store between 2008 and 2015. *Id.* ¶ 53. Gaines alleges that Morales was openly hostile towards her, lodged unfair attacks and criticisms of her performance, assigned her to less desirable duties, and indicated that he was trying to replace her with a younger, female Hispanic employee. *Id.* ¶¶ 55-56, 58-63. Gaines alleges that she reported her concerns to ARSM Reichow and her report was dismissed. *Id.* ¶ 57. Gaines left AT&T's employ in August 2015. *Id.* ¶ 66.

Plaintiff Ryan Bagsby is a 42-year-old African-American male who worked for AT&T between 2014 and 2015 at the AT&T Mission Valley store. Bagsby alleges that Morales unfairly attacked Bagsby's performance in an effort to undermine Bagsby's success, misrepresented AT&T's paternity leave policy to Bagbsy's detriment and told Bagsby that he would need to find another job. *Id.* ¶¶ 68-75. Bagsby left AT&T's employ in October 2015. *Id.* ¶ 76.

Plaintiff Branisha Newberry is a 26-year-old African-American woman. She began working at AT&T in 2013 and is currently working as an ASM for AT&T in San Diego County. *Id.* ¶ 87. Newberry worked at the Mission Valley Store and prior to Morales' arrival, Newberry had been told that she was considered to be a high performer and was a candidate to be promoted to a management position. *Id.* ¶ 88. Newberry alleges that Morales unfairly treated Newberry with respect to her attire choices and requests for accommodations for medical appointments. *Id.* ¶¶ 89-93. Specifically, Newberry alleges that Morales treated her and other African-American employees less favorably than he treated the young, primarily Hispanic, female employees who did not object to his sexual conduct and comments. *Id.* ¶ 96. Newberry transferred to another AT&T location, which was in effect a demotion, decreasing her earnings based on her commissions. *Id.* ¶ 97.

Plaintiff Mario Hall is a 33-year-old African-American male who worked for AT&T between 2013 and 2015. He worked at the Mission Valley store starting in 2014. *Id.* ¶ 77. The FAC alleges that Hall was on a path towards advancement at AT&T and was selected to take part in a management-training program. *Id.* ¶¶ 78. However, Morales removed Hall from the program without explanation. *Id.* ¶¶ 79-80. Plaintiffs allege that Morales had previously announced his intention to get rid of both Hall and Newberry, who were seen as the two most promising newer employees at the Misison Valley store. *Id.* ¶ 81. Hall complained to ARSM Reichow that Morales had unfairly removed him from the management-training program, but Reichow "scoffed" at this complaint. *Id.* ¶ 82. Hall also petitioned Reichow to transfer to another location so that he could continue advancing in his career at AT&T, but Reichow declined Hall's request. *Id.* ¶ 83. Due to Hall's complaint to Reichow, Morales retaliated against Hall and terminated him. *Id.* ¶¶ 85-86.

Plaintiff Kenyata Martin is a 42-year-old African-American male who began working for AT&T in 2006 and specifically began at the Mission Valley store in 2012. *Id.* ¶¶ 98-99. The FAC alleges that Morales targeted Martin unfairly by criticizing him for no legitimate reason, acting openly hostile towards Martin, and assigning him less desirable assignments. *Id.* ¶ 99. The FAC also alleges that Morales made derogatory remarks about Martin's skin color and when Martin complained about these remarks to Reichow, Reichow did not take any action to help Martin or to discipline Morales. *Id.* ¶¶ 100-104. In November 2015, Martin transferred to the Downtown San Diego location, which is a less favorable location. *Id.* ¶ 104.

### c. Morales' Termination

In May and June of 2016, two female Hispanic employees reported Morales' sexual harassment – including inappropriate remarks and conduct – and racist remarks. *Id.* ¶¶ 105-106. In August 2016, AT&T initiated an investigation into Morales' sexual

5

harassment of female employees and on August 30, 2016, AT&T terminated Morales' employment. *Id.* ¶ 107. Plaintiffs allege that AT&T has failed to acknowledge, remedy, or disapprove of Morales' mistreatment and abuse of the African-American employees who worked at AT&T's Mission Valley store. *Id.* ¶ 108.

## DISCUSSION

### I. MOTION TO COMPEL ARBITRATION

AT&T argues that Plaintiffs Branisha Newberry ("Newberry") and Kenyata Martin ("Martin") are subject to a binding arbitration agreement and should therefore be compelled to individually arbitrate their claims. AT&T alleges that AT&T sent an email to Newberry and Martin on February 11, 2019 to their company-issued email addresses, explaining that AT&T's Management Arbitration Agreement ("MAA") would apply to each of them unless they opted out within the following 60 days (i.e., by April 12, 2019). ECF No. 31-1 at 9. The emails provided instructions on how Plaintiffs could opt out and advised Plaintiffs that it was "very important for you to review the Management Arbitration Agreement linked to this email." *Id.* The emails advised Plaintiffs that there would be "no adverse consequences for anyone opting out of the Management Arbitration Agreement." *Id.* The emails also included a link to a web page containing the text of the MAA. *Id.* The MAA stated that "any dispute to which [the MAA] applies will be decided by final and binding arbitration instead of court litigation." *Id.* The MAA "applies to any claim that [Plaintiffs] may have against . . . any AT&T company," except for claims related to workers compensation, state disability insurance and unemployment insurance benefits, or to claims arising under the federal Employee Retirement Income Security Act. *Id.* at 10.

AT&T then sent four reminder emails on February 25, March 11, March 25, and April 8 of 2019. *Id.* at 10. AT&T monitored whether the email recipients had set up an "out of office reply" or if the email message itself was returned as undeliverable. *Id.* No

message was returned as undeliverable, and only one message (an e-mail message to Plaintiff Martin) triggered an "out of office" reply. *Id.* All email messages contained the subject line "Action Required: Notice Regarding Arbitration Agreement." *Id.* Plaintiffs Martin and Newberry state that they do not remember receiving or reviewing the original arbitration announcement or any of the four reminder announcements. Martin Decl. ¶¶ 7, 8; Newberry Decl. ¶¶ 7, 8.

On July 5, 2019, AT&T contacted Plaintiffs to remind them of the existence of the MAA and inform them that AT&T would move to compel arbitration. ECF No. 31-1 at 10. Plaintiffs refused to stipulate to arbitration. *Id.* at 11.

### a. Legal Standard

Pursuant to the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Once the court has determined that an arbitration agreement involves a transaction involving interstate commerce, thereby falling under the FAA, the court must consider: (1) whether a valid arbitration agreement exists; and (2) whether the scope of that agreement to arbitrate encompasses the claims at issue. *See* 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If a party seeking to compel arbitration establishes these two factors, the court must compel arbitration. *See United Computer Sys., Inc., v. AT & T Corp.*, 298 F.3d 756, 766 (9th Cir. 2002). If the party seeking to compel arbitration establishes both factors, the court must compel arbitration. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

However, the FAA's savings clause "allows courts to refuse to enforce arbitration agreements 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622 (2018) (quoting 9 U.S.C. § 2). "The clause 'permits agreements to arbitrate to be invalidated by generally applicable

7

contract defenses, such as fraud, duress, or unconscionability.'" *Id*. (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)) (internal quotation marks omitted). Under the FAA, a party may challenge the validity or applicability of an arbitration provision by "raising the same defenses available to a party seeking to avoid the enforcement of any contract." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1121 (9th Cir. 2008) (internal citations omitted). When deciding whether the parties agreed to arbitrate a certain matter, courts generally apply ordinary state law principles of contract interpretation. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("Courts generally should apply ordinary state-law principles governing contract formation in deciding whether [an arbitration] agreement exists.").

### b. Discussion

AT&T argues that since the general AT&T policy required employees to check their emails, and Newberry and Martin's continued to work at AT&T after the opt-out period expired, Newberry and Martin consented to the MAA. Plaintiffs counter that AT&T has failed to establish Newberry and Martin's consent since (1) proper notice of an arbitration agreement requires more than an email; and (2) AT&T has failed to show that Newberry and Martin consented to the MAA.

#### 1. Sufficient Notice

Parties disagree as to whether AT&T's delivery of the MAA in email form, without more, constitutes sufficient notice of the MAA. Plaintiffs argue that proper notice requires more than an email given the unreliability and inadequacy of email communication. AT&T argues that an arbitration agreement can be formed electronically and that hard-copy documents are unnecessary.

Plaintiffs urge this Court to follow *Lasalle v. Vogel*, 36 Cal. App. 5th 127 (Ct. App. 2019) where the California Court of Appeal held that a default judgment should not have been entered against an attorney following his failure to timely answer after having

8

received notice by email. The *Lasalle* court explained that "by law emails are insufficient to serve notices on counsel in an ongoing case without prior agreement and written confirmation." *Lasalle v. Vogel*, 36 Cal. App. 5th 127, 138 (Ct. App. 2019) (citing Cal.C.C.P. §§ 1013, subd. (e); 1010.6, subd. (a)(2)(A)(ii); Cal. Rules of Court, rule 2.251(b)). However, this standard of notice has not historically extended to arbitration contracts as courts have accepted arbitration agreements delivered by email. *See e.g.*, *Knepper v. Ogletree, Deakins, Nash, Smoak & Stewart, P.C.*, No. 18-CV-00303-WHO, 2019 WL 144585, at *5 (N.D. Cal. Jan. 9, 2019); *Doubt v. NCR Corp.,* 2010 WL 3619854, at *3 (N.D. Cal. Sep. 13, 2010).

While the Court notes that even when companies deliver arbitration agreements by email, those companies have also sent duplicate hard copies, *see e.g.*, *Aquino v. Toyota Motor Sales USA, Inc.*, 15-CV-05281-JST, 2016 WL 3055897, at *4 (N.D. Cal. May 31, 2016) (Toyota sent arbitration agreement to employees via company email accounts and a duplicate hard copy to their home addresses), the Court ultimately declines to find that email delivery method alone is fatal to a motion to compel arbitration.

### 2. Consent

AT&T further argues that Newberry and Martin's failure to opt out and continued employment at AT&T are sufficient to establish their consent to be bound by the MAA, given their continued employment at AT&T and AT&T's general policy requiring employees to check their email inboxes. However, Plaintiffs counter that these factors are insufficient to prove consent and that AT&T is required to prove that Plaintiffs actually received and read the emails containing the link to the MAA and the MAA itself.

The Ninth Circuit has previously held that since an employee and employer "[are] not two typical parties contracting at arm's length," employees generally have a responsibility to affirmatively opt out of an arbitration agreement if they do not wish to accept. *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1109 (9th Cir. 2002). Therefore,

an employee's failure to opt-out of an arbitration agreement can bind that employee to the arbitration agreement. *See e.g., Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072 (9th Cir. 2014); *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104 (9th Cir. 2002); *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198 (9th Cir. 2002).

However, the Ninth Circuit has noted the significance of the acknowledgment of receipt in circumstances where a party has failed to opt out. The Ninth Circuit's analysis in *Najd* is illustrative of the significance of the acknowledgment of receipt. The *Najd* court noted the plaintiff-employee's acknowledgment of his receipt of the arbitration agreement in writing, and that this form "clearly set out in writing the significance of his failure to opt out and described in detail the mechanism by which he could express his disagreement." *Id.* at 1109. The *Najd* court also noted that the plaintiff-employee had the "explicit opportunity to review the agreement with an attorney highlighted the legal effect of the agreement" and that "[i]n other circumstances acceptance by silence may be troubling, and explicit consent indispensable." *Id.* Considering these factors, the *Najd* court held that it was acceptable to infer the plaintiff's consent. In *Ahmed*, the employee similarly signed an acknowledgment of receipt of the arbitration agreement and opt-out form. *Ahmed*, 283 F.3d at 1199 (9th Cir. 2002).[1]

Here, AT&T failed to require and obtain Newberry and Martin's acknowledgment of their receipt of the MAA. As a general rule, "silence or inaction does not constitute acceptance of an offer." *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal.App.4th 1372, 1385 (1993); *see also Sorg v. Fred Weisz & Assocs.*, 14 Cal.App.3d 78, 81 (1970). California courts have long held that "[a]n offer made to another, either orally or in

---

[1] In *Johnmohammadi*, the employer communicated the option to opt-out of the arbitration program by including the information on the employment application, in the employee handbook, and the new hire brochure. *Johnmohammadi v. Bloomingdales, Inc.*, No. CV 11-6434-GW(AJWX), 2012 WL 13036845, at *2 (C.D. Cal. Jan. 26, 2012). Additionally, in *Johnmohammadi*, the plaintiff did not deny receipt of the documents related to the arbitration agreement or challenge the manner of delivery.

10

writing, cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, for the offerer cannot prescribe conditions of rejection so as to turn silence on the part of the offeree into acceptance." *Leslie v. Brown Bros. Inc.*, 208 Cal. 606, 621 (1929); *see also* 1 Witkin, Summary of California Law, Contracts § 193 (10th ed. 2005) (collecting California cases). Given Newberry and Martin's lack of acknowledgment of their receipt of the MAA, their silence alone is insufficient to constitute consent.

AT&T urges this Court to follow the First Circuit in *Rivera-Colón v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 205 (1st Cir. 2019). However, in *Rivera-Colón*, AT&T required the employees' acknowledgment of their receipt – regardless of whether they chose to opt out. In order to complete this step of acknowledging receipt, the AT&T employees were required to click on a button marked "Review Completed" on the webpage that contained the full text of the arbitration agreement. AT&T's records showed, and plaintiff-employee did not contend otherwise, that the plaintiff-employee did in fact complete this step of acknowledging receipt. Further, according to AT&T's internal records, the plaintiff-employee viewed the arbitration agreement twice.

AT&T also cites *Norcia v. Samsung Telecommunications Am.*, *LLC* for the proposition that silence can be deemed to constitute acceptance. 845 F.3d 1279 (9th Cir. 2017). However, the *Norcia* court explained that the general rule is that silence cannot constitute acceptance, and that there are only limited exceptions to this rule – for example, when the offeree has a duty to respond to an offer and fails to act in the face of this duty. *Id.* at 1285. The *Norcia* court cited *Gentry v. Superior Court* where the employee signed an acknowledgment of receipt of an "issue resolution package," which included 30-day opt-out provision of arbitration agreement, thereby his "intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." 42 Cal.4th 443, 468 (2007). The *Gentry* court found that "[h]aving thus indicated his intent,

[the plaintiff] may not now claim that the failure to opt out did not constitute acceptance of the arbitration agreement." *Id.* (citing 1 Corbin on Contracts (rev. ed. 1993) § 3.21, p. 414). Further, the *Gentry* court found that by signing this form, the employee "manifested his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Id.* As a result, the California Supreme Court concluded that the employee's failure to act constituted acceptance of the agreement. *Id.*[2]

Here, as already discussed, Plaintiffs Newberry and Martin did not sign any comparable acknowledgment form. As such, AT&T has failed to establish that Newberry and Martin consented to the MAA.[3] The Court therefore **DENIES** AT&T's motion to compel arbitration.

## II. MOTION TO STRIKE

AT&T seeks to strike the following three categories of allegations: "(1) sexual harassment allegations against former Sales Director Art Felix by a former AT&T

---

[2] AT&T also cites several out-of-district cases: *AT&T Mobility Servs. LLC v. Inzerillo*, No. 4:17-cv-00841-HFS, at 3 (W.D. Mo. Jan. 31, 2018) (applying Missouri law); *Bolden v. AT&T Servs., Inc.*, 350 F. Supp. 3d 1029, 1034 (D. Kan. 2018) (applying Kansas law); *Danielski v. AT&T*, No. D-1-GN-14-00718, at 1 (Tex. Dist.-Travis Cnty., May 28, 2014); *Powe v. AT&T d.b.a. AT&T Mobility*, No. 3:15-cv-00022-GFVT, at 6 (E.D. Ky. Mar. 25, 2016) (applying Kentucky law); *Couch v. AT&T Servs., Inc.*, No. 13-CV-2004 (DRH) (GRB), 2014 WL 7424093 (applying New York law). ECF 39 at 9. As already discussed, the issue of contract interpretation is one governed by state law. Here, the applicable law is therefore California state law and the Court therefore elects to follow the reasoning of cases governed by California law.

[3] Plaintiffs argue that AT&T is required to show that Newberry and Martin actually opened and read the email and points to the circumstantial corroboration of past instances where AT&T has shown its capability to prove that an employee has read the arbitration agreement. Since the Court has already resolved the question of consent on the basis of AT&T's failure to obtain acknowledgment of receipt, the Court need not answer this question. However, the Court notes the insufficiency of Plaintiff's argument that AT&T has the capability of showing that an individual recipient of an email reviewed the arbitration agreement by tracking whether that individual entered their username and password to access the web page containing the text of an arbitration agreement. ECF No. 37 at 16-17. In the case cited by Plaintiffs, *Karzon v. AT & T, Inc.*, No. 4:13-CV-2202 CEJ, 2014 WL 51331 (E.D. Mo. Jan. 7, 2014), the plaintiff worked for an AT&T subsidiary, and the arbitration agreement at issue was sent in 2019; there is no guarantee that the technology was the same for the agreements sent by AT&T to Plaintiffs in 2019.

employee in March 2013; (2) sexual harassment allegations regarding Defendant Morales made by AT&T employees (not Plaintiffs); and (3) allegations regarding complaints from two former AT&T employees in 2010 that do not relate to race, but instead generically claim Defendant Morales was a bully, unethical or unprofessional." ECF No. 30-2 at 12. Specifically, AT&T seeks to strike either portions or the entirety of the following paragraphs from the FAC: 1, 2, 20-26, 28-35, 42, 44-49, 51, 52, 58, 92, 96, 105-107. ECF No. 30, Exhibit A. AT&T argues that all of these aforementioned claims are unrelated to race-based discrimination and therefore outside the scope of permissible claims under Section 1981. AT&T also argues that these claims are otherwise time-barred and the subject of prior litigation.

**1. Legal Standard**

A motion to strike is brought under Federal Rule of Civil Procedure 12(f). Rule 12(f) provides that a "court may strike from a pleadings an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The function of a motion to strike is to avoid unnecessary expenditures that arise throughout litigation by dispensing of any spurious issues prior to trial. *Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885 (9th Cir. 1983). Rule 12(f) motions "are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic." *Neilson v. Union Bank of Cal., N.A.,* 290 F.Supp.2d 1101, 1152 (C.D. Cal. 2003). Therefore, "motions to strike are generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Griffin v. Gomez*, 2010 WL 4704448 at *4 (N.D. Cal. Nov. 12, 2010) (citing *LeDuc v. Ky. Cent. Life Ins. Co.*, 814 F.Supp. 820, 830 (N.D. Cal. 1992)); *see also* § 1382 Motion to Strike—Redundant, Immaterial, Impertinent, or Scandalous Matter, 5C Fed. Prac. & Proc. Civ. § 1382 (3d ed.) (noting that "because federal judges have made it clear . . . that Rule 12(f) motions to strike on any of these grounds are not

favored, often being considered purely cosmetic or 'time wasters,' there appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action") (citations omitted).

Given the disfavored status of motions to strike, "courts often require a showing of prejudice by the moving party before granting the requested relief." *Id.* (citing *Securities and Exchange Commission v. Sands,* 902 F. Supp. 1149, 1166 (C.D. Cal. 1995)). "In exercising its discretion, the court views the pleadings in the light most favorable to the non-moving party and resolves any doubt as to the relevance of the challenged allegations in favor of plaintiff." *Id.* at 1152. "Any doubt concerning the import of the allegations to be stricken weighs in favor of denying the motion to strike." *Park v. Welch Foods, Inc.*, 2014 WL 1231035, at *1 (N.D. Cal. Mar. 20, 2014) (quoting *In re Walmart Stores, Inc. Wage & Hour Litig.*, 505 F.Supp.2d 609, 614 (N.D. Cal. 2007) (internal quotation marks omitted)).

**2. Discussion**

AT&T argues that the Court should grant their motion to strike Plaintiffs' allegations since they are (1) outside the scope of permissible claims under Section 1981 since they are not related to race-based discrimination; (2) cannot form the basis of a punitive damages claim; and (3) cannot be used as "me too" evidence to establish past discriminatory or retaliatory behavior to prove wrongful conduct against a plaintiff.

**a. Scope**

AT&T urges this Court to follow *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993), *rev'd*, 510 U.S. 517 (1994). In *Fantasy*, a song copyright holder brought an infringement action against the musician who originally wrote the song. The defendant-musician filed a counterclaim, seeking rescission of the music publishing agreement

14

entered into with the copyright holder's predecessor. The defendant described the predecessor's fraudulent tax shelter plan as "relevant background and foundational facts" in order to establish a pattern of abuse to support his claim of the musician's material breach of the music publishing agreements. *Id.* at 1528. The *Fantasy* court granted the copyright holder's motion to strike the counterclaim, noting that the defendant had failed to prove that the conduct of the plaintiff's predecessor was relevant to the plaintiff's conduct. The *Fantasy* court also concluded that these allegations about the plaintiff's predecessor would lead to "unwarranted and prejudicial" inferences against the plaintiff. *Id.*

Here, AT&T argues that many of the allegations regarding sexual harassment complaints against Morales are similarly outside of the scope of Plaintiff's claims under Section 1981. However, Plaintiffs' allegations here are decidedly more relevant to Defendants' conduct and culpability since several of Plaintiffs' claims regarding Morales' alleged sexual harassment of AT&T employees are directly relevant to the nature of Morales' termination. For example, AT&T notes that it terminated Morales for his sexual harassment or gender discrimination in August 2016. ECF No. 41 at 9. Striking any allegations that are relevant for understanding the nature of Morales' termination at this juncture would be premature. The Court therefore **DENIES** AT&T's motion to strike with regard to **FAC ¶¶ 105-107.**

Plaintiffs argue that the other allegations concerning Morales' conduct while at the Mission Valley branch are related to Morales' alleged racial discrimination; for example, Plaintiffs allege that Morales pushed out African-American employees in order to replace them with young, Latina employees whom he then serially sexually harassed. ECF No. 36 at 18 (citing FAC ¶¶ 33, 44, 50-52, 58, 92, 96, 105-107). The Court agrees. The Court therefore **DENIES** AT&T's motion to strike with respect to allegations regarding Morales' conduct at the Mission Valley branch – i.e., **FAC ¶¶ 44, 51, 52, 58, 92, 96.**

### b. Punitive Damages

The remaining excerpts and full paragraphs that AT&T seeks to strike (FAC ¶¶ 1, 2, 20-26, 28-35, 42) describe AT&T's corporate policies regarding discrimination and harassment on the basis of race and/or gender (FAC ¶¶ 1, 2, 20-25); allegations about sexual harassment and assault committed by other AT&T executives (not Morales) (FAC Section B; ¶¶ 26, 42, 45-49); and allegations against Morales before he began working at the Mission Valley branch (FAC ¶¶ 28-35).[4]

Plaintiffs argue that the motion to strike these claims should be denied on the grounds that they are related to punitive damages liability. In order to establish an employer's liability for punitive damages in the employment discrimination context, the plaintiff must establish that the employer has engaged in intentional discrimination and acted "with malice or with reckless indifference to the federally protected rights." *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 534 (1999). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535. Adopting principles of agency, the Supreme Court held that punitive damages liability may be proper if one of the four conditions is met: "(1) the principal authorized the doing and the manner of the act, or (2) the agent was unfit and the principal was reckless in employing him, or (3) the principal or a managerial agent of the principal ratified or approved the act, or (4) the agent was employed in a managerial capacity and was acting in the scope of employment." *Id.* at 542-43. The Ninth Circuit has also adopted the reasoning of other circuits that have reached the conclusion "that the inaction

---

[4] Allegations regarding AT&T's policies are not sufficiently prejudicial to warrant striking and would also not require extensive discovery. Since they are more relevant than they are prejudicial or would be wasteful of time and resources, the Court accordingly **DENIES** AT&T's motion to strike with regard to FAC ¶¶ 1, 2, 20-25.

16

of even relatively low-level supervisors may be imputed to the employer if the supervisors are made responsible, pursuant to company policy, for receiving and acting on complaints of harassment." *Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001). The *Swinton* court denied the defendants' good-faith defense, reasoning that it is "insufficient for an employer simply to have in place anti-harassment policies; it must also implement them." *Id.* at 810–11.

Plaintiffs urge the Court to follow *Pease & Curren Ref., Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945 (C.D. Cal. 1990), *abrogated on other grounds by Stanton Rd. Assocs. v. Lohrey Enterprises*, 984 F.2d 1015 (9th Cir. 1993). In *Pease*, the court considered whether to strike allegations made by a waste refinery against its client in a case involving an explosion of dozens of the client's drums of waste. The waste refinery alleged that the client had improperly trained its employees which had led to previous occasions where the client had mislabeled drums of waste. *See id.* at 947. While the waste refinery initially claimed that the defendant's mislabeling of the waste drums led to the explosion, it later amended its complaint to admit that the client's mislabeling did not cause the explosion, and that the explosion was instead caused by the drying of a metal flake inside waste drums. *See id.* The plaintiff nevertheless maintained that the mislabeling allegations were relevant in establishing the client's "pattern of carelessness," and therefore material to their claim for punitive damages. *Id.* at 948. The court considered the motion to strike "premature at best," and held that the mislabeling allegations appeared to be "quite relevant to whether [the defendant] acted with conscious disregard for the safety of others" and therefore relevant to a punitive damages claim. *Id.* The court declined to strike the allegations from the complaint.

Similarly, here, although the sexual harassment allegations are different in kind from the allegations of race-based discrimination under Section 1981, they may

nevertheless inform any pattern of carelessness on the part of AT&T with respect to maintaining the integrity of the workplace based on their hiring and firing of managers.

Plaintiffs argue that AT&T's knowledge of unfitness need not constitute the identical type of conduct later sued upon by plaintiff. Plaintiffs cite as support *Arpajian v. Prop. Sols., Inc.*, No. CIV. A. 03-4666(JBS), 2005 WL 2000172, at *12 (D.N.J. Aug. 16, 2005), where the court held that punitive damages were warranted against a company that had failed to fire a manager despite repeated accusations of sexual harassment. While the court noted that the manager had "known drug problems," the court did not explicitly rule on whether this evidence should be properly considered in a punitive damages claim. Plaintiffs also cite *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001) in support. However, the *Swinton* court held that district courts may, in their discretion, allow a defendant-employer to introduce evidence of remedial conduct undertaken in response to its discovery of discrimination as a means of mitigating punitive damages. The court reasoned that adopting this approach would be favorable since it would encourage employers to implement remedial measures, while still leaving plaintiffs the opportunity to argue that such remedial conduct was "too little too late." *Id.* at 815. Here, neither party seeks to admit evidence of AT&T's remedial actions.

AT&T counters that Section 1981 claims are limited to race-based discrimination and therefore the scope of any evidence considered for the determination of punitive damages claims must be limited to claims related to race. ECF No. 41 at 7-10. AT&T cites the Restatement Second, Torts § 909 for the proposition that an employer's vicarious liability for the purposes of punitive damages must be limited to situations where "an employer who has recklessly employed or retained a servant or employee who was known to be vicious if the harm resulted from that characteristic." ECF No. 41 at 9. AT&T additionally cites the illustrative example provided by the Restatement indicating that punitive damages may be properly awarded when an ejectment company hires a

company with a reputation for using undue force to dispossess a tenant, and the company, in accordance with its usual methods, commits an unprovoked battery upon the wife of the tenant. *Id.*

At this premature stage, the Court declines to draw a bright line between the conduct that may be properly considered for a Section 1981 claim and the conduct that may additionally be considered to establish a pattern of carelessness for the purposes of punitive damages. The difficulty of analyzing the relevancy and admissibility of the allegations of sexual assault at this stage speaks to the tendency of courts to avoid resolving questions of relevancy and admissibility solely on the pleadings. *See Pease & Curren*, 744 F. Supp. at 947.[5] The Court therefore **DENIES** AT&T's motion to strike FAC Section B; ¶¶ 26, 28-35, 42, 45-49.

In sum, the Court **DENIES** AT&T's motion to strike portions of the FAC.

**IT IS SO ORDERED.**

Dated: December 10, 2019

Hon. Gonzalo P. Curiel
United States District Judge

---

[5] Plaintiffs also claim that, in the alternative, the allegations should be admissible as "me too" evidence. Since the Court has already denied AT&T's motion to strike on other grounds, the Court need not answer this question. However, the Court notes that "me too" evidence has been utilized for situations where it is "clear that an employer's conduct tending to demonstrate hostility towards a certain group . . . is the true reason behind firing an employee who is a member of that group." *Heyne v. Caruso*, 69 F.3d 1475, 1479 (9th Cir. 1995). On this basis, the allegations of sexual harassment would therefore be inadmissible on the "me too" basis. Plaintiffs cite case law that illustrate the degrees of separation that can exist between a defendant and the individuals that committed the alleged discriminatory acts; however, these cases do not address the discrepancy between the kinds of discrimination alleged.

19

19-cv-946 GPC MSB